IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOHAMMED AZHARUDDIN CHHIPA,<br><br>Defendant. | Case No. 1:23-CR-97<br><br>Hon. David J. Novak |

## MOTION TO QUASH SUBPOENAS

The United States of America, through undersigned counsel, hereby respectfully moves pursuant to Federal Rule of Criminal Procedure 17(c)(2) to quash defendant's subpoenas commanding the appearance and testimony at trial of Federal Bureau of Investigation ("FBI") Special Agent Patrick Higgins and FBI Special Agent Jeffrey Scott.

### Subpoenas at Issue

On September 23, 2024, the defendant served on the government subpoenas seeking the testimony at trial of four government employees: FBI Special Agent Patrick Higgins, FBI Special Agent Jeffrey Scott, and two undercover FBI employees ("OCE-5" and "UCE-2"). The subpoenas were accompanied by a letter, attached as Exhibit A, which, in accordance with the requirements of *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), summarized the testimony sought. In particular, the defendant described the purpose of the subpoenas as obtaining testimony relating to law enforcement's "scheme to have certain individuals appear as though they were assisting in brokering a marriage between Mr. Chhipa and a woman overseas." Ex. A, at 1. The letter described Special Agents Higgins and Scott as "law enforcement officers who assisted in creating and executing this plan," OCE-5 as "an individual who pretended to be a relative of Mr. Chhipa's prospective bride and with whom Mr. Chhipa corresponded over the internet," and UCE-2 as a

"fake relative of Mr. Chhipa's prospective bride living in the United States, and with whom Mr. Chhipa met on two occasions." *Id.* at 1-2.  The letter explained that "[t]he testimony sought involves details of these audio/video-recorded meetings between Mr. Chhipa and UCE-2 which were purportedly to 'vet' Mr. Chhipa as a husband and broker marriage arrangements," and further "would include multiple times Mr. Chhipa was encouraged by undercover agents to keep donating money to 'sisters' in refugee camps." *Id.* at 2.

The government intends to call in its case-in-chief both OCE-5 and UCE-2; however, the subpoenas of Special Agents Jeffrey Scott and Patrick Higgins (attached as Exhibit B) should be quashed because the defendant has failed to satisfy the requirements for issuing subpoenas under Rule 17.  Namely, the requested testimony is neither material nor favorable to defense, and is instead cumulative of the testimony of OCE-5 and UCE-2, unhelpful to the defendant, unlikely to affect the judgement of the trier of fact, and otherwise inadmissible.  *See United States v. Galecki*, 932 F. 3d 176, 186 (4th Cir. 2019) (explaining that a defendant's right to compulsory process is dependent on the defendant demonstrating that the proposed testimony be "exculpatory," "not merely cumulative to the testimony of available witnesses," present a "reasonable likelihood that the testimony could have affected the judgement of the trier of fact," and be "otherwise admissible").

### Background on OCE-5 and UCE-2

On approximately February 9, 2020, OCE-5 contacted the defendant on Telegram private message on the pretext that OCE-5 was a friend of a foreign confidential source ("T.M.") whom the defendant had previously befriended online.  OCE-5 offered to act as a go-between for the defendant and T.M. with respect to the defendant's interest in marrying T.M.  In their first conversation, the defendant described his history with law enforcement, and OCE-5 congratulated

the defendant on staying resolute. OCE-5 cautioned the defendant, however, "If you are in a situation where the 'authorities . . . are looking at you, you should carefully consider whether your intentions for the future include things that might bring you into more conflict with them. Bc if so [T.M.] should be prepared for that." OCE-5 also asked the defendant whether he intended "to do more," since T.M. would want to know before entering marriage with him. The defendant responded, "Whether or not they can arrest me for helping the sisters in the camps . . . I'm nt sure but regardless I don't care . . . I'm going to continue it and if I go to prison then Al'hamdulillaah."

In May 2020, the defendant told OCE-5 that he was worried because T.M. asked him questions like, "Which group do you support?" and, "Do you support Dawlah [ISIS]?" The defendant stated, "[Y]ou can easily tell from my posts who I support and what I stand for, so I really didn't understand why anyone would ask who I support when all they'd have to do is look at the content I'm sharing and posting." The defendant clarified that he wanted to make sure T.M. was real and not a "white kaafir [non-believer]." OCE-5 responded, "I get why you feel the way you do about the questions, but the sister does have the right to know what she's getting into with regard to where you stand and what you stand for." OCE-5 went on to state, "She probably wants to know not only if you support Dawlah [ISIS] but like also if you going to do something the kaffirs [non-believers] consider illegal to support them." The defendant responded, "As long as I have spare money left and I can still help the brothers and their families then I will continue to support them [ISIS] for as long as I'm able." OCE-5 asked if the defendant thought he would be arrested, because T.M. would find it unsettling to be alone. The defendant responded, "Well they haven't arrested me yet." The defendant added, "Imagine the reward of someone who goes against the tide and actually does something that many are [scared and terrified] to do today. (For example helping the sisters in the camps financially)." OCE-5 asked the defendant if he would be so

committed to helping the sisters if they were not "dawlah [ISIS] and widows of the mujhahideen," and the defendant responded, "Yes, if the[y] were prisoners yes.  But because of the fact [there] are many from the dawlah [ISIS] that makes me more eager to give more because I know the reward for it is much more . . . And we all know the one who supports the family of a mujaahid it is [like] he has fought."

OCE-5 told the defendant that OCE-5 thought that "Dawlah [ISIS] started off with the best of intentions," but had become too extreme with "the killings the burnings the drowning and all of that."  OCE-5 asked the defendant, "[W]hat if your money goes to help restore Dawlah [ISIS]?" and suggested that "if the sisters escape the camp as im sure many of them probably are and are trying to get back [to ISIS territory]."  The defendant responded that he believed the burnings conducted by ISIS were "permissible" and that if the sisters were to escape and try to return to ISIS it would be "fine if they go back to restoring the [ISIS Caliphate]."  With respect to funding ISIS, the defendant told OCE-5, "I don't mind.  As long as the [ISIS Caliphate] is back [on the] path . . . Then I'm all for it."

In a subsequent conversation, the defendant told OCE-5 that he "may not be around for much longer" because "prison or death is one of the possible outcomes for me in the near future." OCE-5 responded by telling the defendant again that OCE-5 "used to support dawlah [ISIS] . . . but also that my feelings about that had changed over time."  OCE-5 suggested to the defendant that with respect to the defendant's life ending in prison or death, "you don't have to do it . . [n]ot for their sake . . you don't need to throw away your life."  The defendant responded, "As per supporting Dawlah [ISIS].  As of right now, they are the only group of Muslims in the world who seem to be upon the Haqq [truth] . . So we should overlook their mistakes and advise them if we are able."

During the course of their conversations, OCE-5 also introduced the defendant to UCE-2, who posed as an individual who could further help vet the defendant for marriage with T.M. The defendant met with UCE-2 twice, with the first meeting occurring in July 2020. The defendant discussed with UCE-2 how he was already sending "money to the sisters . . . I found out about the sisters in the camps, you know the Syrians, so I started sending them help." When asked if he was sure he was sending the money to "good people over there," the defendant replied that he was, because if these people were agents, then he'd "be in prison." The defendant went on to state, "We're not doing anything wrong . . . anything to do with the sisters or in Syria or Turkey, people automatically say terrorist terrorist terrorist, but even if they are a terrorist, even if they're the worst person in the world, as long as they're a Muslim brother or sister . . ." before being interrupted by UCE-2. UCE-2 was generally supportive of the things the defendant told him, but at no point did UCE-2 ask the defendant to send money to ISIS.

The defendant met again with UCE-2 in approximately October 2020, by which time the defendant and T.M. had already agreed to part ways and no longer explore the idea of an engagement. During that meeting, the defendant and UCE-2 predominantly discussed safety precautions online. The defendant explained how the most secure mean of communicating was Telegram's "secret chat." The defendant stated, "Secret chat in Telegram is more encrypted and stuff. So meaning like if they really had that I would be in prison right now. Let's put it that way. I mean, I'm not doing anything wrong, it's just like you know some conversations were that you know sensitive."

## Legal Argument

As the Supreme Court has explained, a defendant's right to compulsory process is not absolute, since "the Sixth Amendment does not by its terms grant to a criminal defendant the right

to secure the attendance and testimony of any and all witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Instead, a defendant's right to compel the appearance of a witness is dependent on the defendant plausibly demonstrating that the requested testimony is "both material and favorable to his defense." *Id.*; *see also Galecki*, 932 F.3d at 182 ("[A] criminal defendant must at least make some plausible showing of how [the excluded] testimony would have been both material and favorable to his defense.") (internal quotation marks omitted); *United States v. Ritchie*, 734 F. App'x 876, 879 (4th Cir. 2018) ("[T]he Defendants' compulsory process right extends only to 'favorable' and 'material' witnesses and evidence."). The Fourth Circuit has explained that in this context, an assessment of whether requested testimony by a defendant is in fact material "has several components: it must be exculpatory; it must be 'not merely cumulative to the testimony of available witnesses;' it must present 'a reasonable likelihood that the testimony could have affected the judgment of the trier of fact;' and it must be otherwise admissible." *Galecki*, 932 F.3d at 186 (quoting *Valenzuela-Bernal*, 458 U.S. at 873-74). A defendant may not use Rule 17 process for the purpose of conducting a "fishing exercise." *United States v. Nixon*, 418 U.S. 683, 699-700 (1974).

Here, the requested testimony of Special Agents Higgins and Scott—case agents involved in managing the investigation during the time that OCE-5 and UCE-2 were interacting with the defendant—would be non-exculpatory, cumulative, unlikely to affect the judgement of the trier of fact, and inadmissible. As such, the subpoenas should be quashed. *Valenzuela-Bernal*, 458 U.S. at 873-74.

First, there is no support either in the evidence or otherwise identified in the defendant's letter to suggest that the testimony of Special Agents Higgins and Scott would be in any way favorable to the defense. *See* Ex. A. Indeed, the fact that Special Agents Higgins and Scott were

case agents for an investigation involving an undercover operation that resulted in the defendant making numerous inculpatory statements—and in the case of OCE-5 even at times arguing with the undercover officer in defense of ISIS—suggests that their testimony, if anything, would be harmful to the defendant.  It is not sufficient for the defendant to simply speculate otherwise; he must have some plausible basis for believing the Special Agents' testimony would be helpful to his defense. *United States v. Rivera*, 412 F.3d 562, 570 (4th Cir. 2005) ("[A defendant does not have a] Sixth Amendment right to conduct an exploratory foray based on mere speculation.")

Further, the sought testimony is plainly cumulative of the testimony to be provided by OCE-5 and UCE-2.  The defendant has indicated that he intends to call Special Agents Higgins and Scott in order to illicit testimony about the undercover operation executed by OCE-5 and UCE-2.  *See* Ex. A. The government is already calling OCE-5 and UCE-2 and has provided the defendant with the recordings and online communications between OCE-5, UCE-2, and the defendant, respectively.  Through OCE-5 and UCE-2, the government intends to offer into evidence a number of those communications, as well as to describe the undercover operation in which they were obtained.  Testimony of two other agents on the investigative team, agents who were not directly in communication with defendant, will add nothing to the testimony provided by OCE-5 and UCE-2, and will open no new areas of cross examination not already available through OCE-5 and UCE-2.  *See Valenzuela-Bernal, 458 U.S. at 873; Galecki*, 932 F.3d at 186; *see also United States v. Weisman*, 858 F.2d 389, 392 (8th Cir. 1988) ("The record sufficiently supports the District Court's denial of Weisman's request for subpoenaing the two witnesses, because their testimony would have been repetitive and cumulative."); *Roussell v. Jeane*, 842 F.2d 1512, 1516 (5th Cir. 1988) ("[T]he right to call a witness is not absolute . . . For example, a defendant is not entitled to burden the proceedings with cumulative testimony.").  For similar reasons, the exclusion of such

testimony is unlikely to have any effect on the judgement of the trier of fact as the same testimony will already be offered through OCE-5 and UCE-2.

Finally, to the extent the defendant intends to call Special Agents Higgins and Scott for the purpose of delving into discussions they had with OCE-5 or UCE-2 about their undercover work with the defendant (as it is difficult to see the relevance of any other testimony), such testimony would almost certainly be inadmissible hearsay.  Fed. R. Evid. 801-802.

## <u>Conclusion</u>

Therefore, for the above-stated reasons, the United States asks the Court to quash the aforementioned subpoenas issued to FBI Special Agent Patrick Higgins and FBI Special Agent Jeffrey Scott, respectively.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

*/s/ Andrew J. Dixon*
Anthony T. Aminoff
Amanda St. Cyr
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov

Andrew J. Dixon
Andrea Broach
Trial Attorneys
Counterterrorism Section
National Security Division, Dept. of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of November, 2024, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system.

           */s/ Andrew J. Dixon*
           Andrew J. Dixon
           Trial Attorney
           National Security Division
           Counterterrorism Section
           950 Pennsylvania Avenue NW
           Washington, DC 20530
           Telephone (202) 353-9349
           Andrew.J.Dixon@usdoj.gov