IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:23-cr-97 |
| v. | Hon. David J. Novak |
| MOHAMMED AZHARUDDIN CHHIPA, | Trial: December 6, 2024 |
| Defendant. | |

## UNITED STATES' TRIAL MEMORANDUM

The United States files its trial memorandum as follows:

## I.    SUMMARY OF THE FACTS

### A.    Pre-Indictment Conduct

Beginning in approximately March 2019, the defendant, Mohammed Chhipa, was posting pro-ISIS, pro-Jihadi content online using Facebook and Instagram profiles created under aliases. In the summer of 2019, he repeatedly sent money to women in the Philippines. On July 24, 2019, those women were arrested for ISIS-related terrorism offenses by Filipino law enforcement. On August 2, 2019, FBI agents executed a search warrant of the defendant's home. His electronic devices were seized, and a large amount of Islamic State propaganda was recovered from those devices. Following the search, the defendant was under surveillance by the FBI. He managed to elude the FBI and escape to Latin America. The FBI found bus tickets in misspelled versions of his name going from Atlanta to Texas, and then an additional bus reservation going to Mexico City. He was returned to the United States and FBI agents attempted to interview the defendant at Dulles airport. They placed a dossier of documents in front of him, which he looked through. These documents included: (1) a news article from NPR about Al Hol camp entitled "'We Pray For the

Caliphate To Return': ISIS Families Crown Into Syria Camps;" (2) news articles about "ISIS member" Radwan Dakkak and a foiled "terror plot" that he was implicated in; (3) Facebook communications between the defendant and Radwan Dakkak; (4) a news article about the Filipino women Joyce Ann Fornal and Nai Nor Aizis Buday being arrested for "illegal possession of firearms, ammunition and explosives" and illegally purchasing bomb-making materials for the Turaife Group (identified in the article as linked to the Islamic State); (5) financial records showing the defendant sending money to Fornal, among others; pro-Islamic State content from the defendant's social media and electronic devices. The defendant declined to speak with the agents at that time. Shortly thereafter, he approached the agents and asked them why he was not being placed under arrest in light of the documents he had just reviewed, holding out his hands to mimic being placed in handcuffs. The FBI warned the defendant to avoid the kinds of activities and people from the documents he had just reviewed if he wanted to avoid further issues with law enforcement.

The government intends to introduce evidence from a cell phone seized from the defendant's bedroom and a desktop computer seized from the family living room.[1] From each, the government will offer some items to demonstrate that the defendant is the user of the devices. From the defendant's cell phone, the government will offer: one audio/video file of a pro-ISIS music video showing combat, high-profile ISIS leaders, etc.; one audio file of the defendant explaining that Muslims need a caliphate, and that the current "Islamic State" is being "bombarded;" one Telegram message sent by the defendant advising on methods to evade social media company detection of pro-ISIS content, including the use of the term "ikhwan"[brothers]

---

[1] The government offers illustrative examples here, but the government's exhibit list is not due until December 3, 2024, and the government reserves the right to make additions or subtractions from its proposed exhibits.

instead of "mujahideen;" and several documents or images containing pro-ISIS and pro-jihadist content, including documents promoting violence on behalf of ISIS, donations to pro-ISIS causes and individuals, and the role of women in the jihad; and one image of a beheaded ISIS captive. From the desktop computer, the government will offer: the desktop image for the user "azhar," showing a folder titled "aL-hOUL;" several PDF, Word or text documents downloaded or drafted by the defendant describing the role of women in jihad, a copy of the ISIS official magazine, Dabiq, and essays on jihad and non-cooperation with nonbelievers authored by high-profile jihadists like Anwar al-Awlaqi; and one image with text promoting violence on behalf of jihad. The government will also introduce a Word document containing 40 pages of login information, and another file called "Facebook accounts new.txt" that reference the login information for the Facebook/Instagram accounts that the defendant used during and in furtherance of the charged conspiracy.

B.  Count 1: Conspiracy to Provide Material Support to ISIS

     i.     Fundraising on Social Media

Shortly after the search of his residence and his return to the U.S., in approximately October 2019, the defendant began to actively fundraise over his social media accounts for women located in prison camps in Syria, particularly Al Hol but also Camp Roj. The government intends to introduce evidence from the following social media accounts used by the defendant:

| Account | How connected to the defendant? |
|---|---|
| Carl Johnson (FB 506082850) | Registered email is wanderer377@gmail.com.<br><br>Wandererer377@gmail.com is registered using phone number XXX-XXX-7294 ("-7294 number").<br><br>-7294 number is linked to defendant through business records and is the phone number of the phone found in his bedroom in 2019. |

| | |
|---|---|
| Carl Johnson continued (FB 506082850) | Stated in conversations: "my real name is Muhammed," that he lived in "Virginia, USA" and that his name is "Azhar."<br><br>Account referenced in "Facebook accounts new.txt" document. |
| Nu'man Ibn Muqrin Al-Muzanee (FB 100036507514619) | Account referenced in "Facebook accounts new.txt."<br><br>Told people he was "Carl Johnson."<br><br>Gave out -7294 cell phone number.<br><br>Stated that he was trying to create Abdullaah Ibn Rawahah profile. |
| Abdullaah Ibn Rawahah (FB 100036328332119) | Account referenced in "Facebook accounts new.txt."<br><br>Said "this is Carl Johnson."<br><br>Told someone "my name is Muhammed Azharuddin." |
| Abdullah Ibn Ateeq (FB 100043053410435) | Account referenced in "Facebook accounts new.txt."<br><br>Alternate names for the account are Abdullaah Ibn Rawahah, Carl Johnson, and An-Nu'maan ibn Muqrin Al-Muzanee.<br><br>Told another user this is "Carl Johnson or Nu'Maan ibn Muqrin" and that he lived in "Northern Virginia." |
| Nu'maan ibn Muqrin Al-Muzanee (IG 13142868803) | Account referenced in "Facebook accounts new.txt."<br><br>Account subscribed in phone number XXX-XXX-4019. Defendant used this number to call the FBI in 2022, and a phone in this number was seized from his residence in 2023.<br><br>In a direct messaging conversation, defendant sent another user information about his brother, Irfan Chhipa. Defendant clarified that that was not his real name, and sent a news article about himself fleeing from the United States in 2019 and said, "this is me." |

Using the above five accounts, the defendant referenced using a number of Telegram accounts and the security benefits of conducting conversations over Telegram. The government

4

will also link the defendant to eight Telegram accounts which are directly involved in communications with undercover personnel.

The defendant publicly posted content praising ISIS, jihad, the mujahideen, pictures of Osama Bin Laden, quotations from al-Qaeda in Iraq founder Abu Mus'ab al-Zarqawi, and quotations from ISIS Emir Abu Bakr al-Baghdadi. He also posted about the role of women in ISIS, posting about them filling in for men in waging jihad and pictures of them carrying firearms.

The defendant also posted about raising funds. One such post was accompanied by a group of women holding an ISIS flag. Another post contained a quote from ISIS leader al-Baghdadi. The defendant wrote that "Muslim women CANNOT and SHOULD NOT be under the control of the kuffar [disbelievers] ever!!" Another post referenced the need to free "the sisters" before they were deported to their home countries, where they will "go to prisons with guards even more worse than the ones they have now and they won't be able to escape." The posts typically encouraged people to give money and to contact someone for details. Typically, that person was "@saabiruwaraabitu" (UCC-1), and often times the defendant just re-posted @saabiruwaraabitu's fundraising posts. As explained by the defendant in another direct message conversation, "saabiruwaraabitu [and another individual] used to be in the camps themselves and they're in touch with other sisters in the camp who are trustworthy . . . and since they already got out, they collect money for the sisters in the camp and they send it to them. They're in Syria, but they already got out, the other sisters are still in the camps, they have their own network, and I support them."

The defendant's role in this conspiracy was primarily to act as a middleman, receiving money from online "donors" and remitting it, typically in cryptocurrency, to female ISIS members like "saabiruwaraabitu" (UCC-1) AKA Umm Imarah AKA Umm Dujana. The defendant explained to another Facebook user, "So if they want to donate to the sisters in the camp, first and

foremost, do not, do not, do not, do not send to the sisters themselves…like with their own account directly to the sisters themselves…never do that…if they were to try to put you in [to prison] for that, then they would have proof against you that, hey, you sent them from your account directly, and who could have sent that other than you? … So what I advise these people, give it to someone who is willing to act as a middleman and then have them give it to the sisters in the camp…you're not giving it to the sisters in the camp directly…you can plead ignorance…obviously you need a brother like this…and I've told them that I'm willing to do this for them."

The defendant discussed that he collected money through Bitcoin and PayPal. He sent his PayPal account email to another user and told the user, "3 sisters have gathered enough money already and only one sister is left who need [sic] about $1,500 more." The other user said they will send what they could and that they would like to contribute in the future with freeing additional women. The defendant also discussed with UCC-1 over her previous Instagram account "seekingshahada" how the money is transmitted, wherein UCC-1 told the defendant, "its never sent directly to me its always sent to Turkey and then secretly sent to me with no tracks."

The government also intends to introduce evidence from three Instagram and two Facebook accounts used by UCC-1. The accounts, all of which the defendant followed, are tied back to UCC-1 through a variety of means. The user tells a common story across all the accounts of once being in the camps, now being out, and fundraising. She has a son named Talha and her in-laws are the Ramic family. One phone number is linked to three of the five accounts. She provided the same Telegram handles across the accounts as a means to contact her. And she re-introduces herself on some of the accounts by explaining that she is the user of a previous account. The following chart summarizes the principal ways the accounts will be linked back to one person:

| Account Subscriber Info | Son named Talha | In-laws are Ramic Family | Linked to phone number: +963-935-927-816 | Linked to Telegram Account @woundsofmusk | Linked to Telegram @shokhbarij | Linked to other Facebook/ Instagram Account |
|---|---|---|---|---|---|---|
| Facebook: 100040997760236 Umm Zubayr Al Muhajirah Sumayyah.muhajirah +963-935-927-816 | Yes | Yes | Yes | | | Linked by cookie to Umm Dujana Al Muhajirah (100046188345030) |
| Facebook: 100046188345030 Umm Dujana Al Muhajirah | Yes | | Yes | Yes | | Linked by cookie to Umm Zubayr al Muhajirah (100040997760236) |
| Instagram: 40620181458 Umm Imarah Saabiruwaraabitu Umm Zubayr Umm Dujanah | Yes | | | Yes | Yes | "its umm dujana/umm zubayr al muhajira" |
| Instagram: 18560124207 Muhajirah fee Bilad Al-Sham Seekingshahada<br><br>Umm Talha al Muhajirah<br><br>+963-935-927-816 | Yes | Yes | Yes | Yes | | |
| Instagram: 5083184739<br><br>Umm Imarah Umm3imarah | | | | | Yes | "my old acc saabiru.. got deleted"<br><br>"my other account saabiru.wa.raabitu got deleted… @umm3imarah"<br><br>"I am umm dujanah" |

UCC-1 posted about ISIS across these accounts. For example, On January 16, 2020, she wrote on one, "When I think about my time in d@w/a [ISIS] it feels like it was a dream…may Allah give us our state back." On January 20, 2020, she posted a picture of a blown-up car and about witnessing a suicide bombing: "This is an istishhaadi [martyrdom] car its full of explosives and the brother who drives it goes to an area where there are kuff@r [non-believers] and blows it up. I remember walking in the streets … and I saw an istishhaadi [martyrdom] car drive past me on the road.. it was like a movie. I was so shocked and excited…'He's going forward driving to meet his Lord in one of the best ways.. he is going to kill and be killed in Allah's Cause!!'"

She posted about fundraising across these accounts. She explained that Camps Hol and Roj and "prison camps." She told another person, "I receive the money and then they get smuggled out and once they reach outside the prison camps we pay the smuggler…the price per person is 19500 dollars to 20k." She passed the defendant's email address, saying "that's the email u send to," to facilitate a Skrill (financial) transfer. And she re-posted this by the defendant, "The Scholars of Islam state that if a Muslim in the East is taken prisoner, it becomes mandatory on the Muslims of the West to seek his release, even if that would lead to them expending all of their wealth."

ii.    OCE 3/5 (S.A. Dale Davis) and UCE-2 (S.A. Imran Jones)

On March 25, 2019, Special Agent ("S.A.") Dale Davis,[2] operating the persona identified as OCE-3 in discovery, began communicating with the defendant on Facebook to discuss a Facebook group that the defendant was active in. Their conversations eventually moved onto Telegram. In June 2019, after the defendant posted a video of how to disable someone with a punch

---

[2] The government is providing full names of the undercover personnel in line with the resolution of the government's CIPA Section 6 motion. *See* Dkt. No. 162.

to the throat, OCE-3 asked the defendant if he was "planning for qital [killing]," to which the defendant responded "Na'am akhee in sha Allaah [yes my brother God willing]." OCE-3 discussed with the defendant that the defendant was planning "an operation." OCE-3 asked the defendant if he was a "dawlah [ISIS] supporter," to which the defendant responded, "Yes of course…"

In approximately October of 2019, the defendant began repeatedly posting about sending money to ISIS women in Syrian prison camps. Beginning on approximately March 22, 2020, OCE-3, who knew the defendant was involved in sending money to Syrian prison camps, told the defendant that he also wanted to send money to a woman in the Syrian prison camps. OCE-3 then asked the defendant if he could confirm that the woman in question was really an ISIS member and asked the defendant if he thought it was okay to give to sisters "who don't support Dawlah [ISIS]." The defendant responded, "I don't mind helping them either as they are still Muslims (some of them) but like if I have a choice (like I do now) then obviously sisters who support dawlah [ISIS]." On March 24, 2020, the defendant informed OCE-3 that he was able to confirm that the woman in the Syrian prison camp was "legit." The defendant then advised OCE-3 on how to send money covertly, recommending, among other things, "Don't mention dawlah or you trying to free them." In September 2020, OCE-3 asked the defendant if the women in the camps would use money sent to them "to go back to Dawlah [ISIS] . . . or they wanna just stay there and buy vegetables and stuff?" The defendant responded, "I'm not sure akhee [my brother] but if they're free again. . . where else are they going to go?"

In February 2020, OCE-5 (also operated by S.A. Dale Davis) contacted the defendant on Telegram private message on the pretext that OCE-5 was a friend of a foreign confidential source ("T.M.") whom the defendant had previously befriended online. OCE-5 offered to act as a go-between for the defendant and the source with respect to the defendant's interest in marrying the

source. In their first conversation, the defendant described his history with law enforcement, and OCE-5 congratulated the defendant on staying resolute. OCE-5 cautioned the defendant, however, "If you are in a situation where the authorities . . . are looking at you, you should carefully consider whether your intentions for the future include things that might bring you into more conflict with them. Bc if so [T.M.] should be prepared for that." OCE-5 also asked the defendant whether he intended "to do more," since the source would want to know before entering marriage with him. The defendant responded, "Whether or not they can arrest me for helping the sisters in the camps . . . I'm nt sure but regardless I don't care . . . I'm going to continue it and if I go to prison then Al'hamdulillaah."

In May 2020, the defendant told OCE-5 that he was worried because T.M. asked him questions like, "Which group do you support?" and, "Do you support Dawlah [ISIS]?" The defendant stated, "you can easily tell from my posts who I support and what I stand for, so I really didn't understand why anyone would ask who I support when all they'd have to do is look at the content I'm sharing and posting." The defendant clarified that he wanted to make sure T.M. was real and not a "white kaafir [non-believer]." OCE-5 responded, "I get why you feel the way you do about the questions, but the sister does have the right to know what she's getting into with regard to where you stand and what you stand for." OCE-5 went on to state, "She probably wants to know not only if you support Dawlah [ISIS] but like also if you going to do something the kaffirs [non-believers] consider illegal to support them." The defendant responded, "As long as I have spare money left and I can still help the brothers and their families then I will continue to support them [ISIS] for as long as I'm able." OCE-5 asked if the defendant thought he would be arrested, because the foreign source would find it unsettling to be alone. The defendant responded, "Well they haven't arrested me yet."

OCE-5 told the defendant that OCE-5 thought that "Dawlah [ISIS] started off with the best of intentions," but had become too extreme with "the killings the burnings the drowning and all of that." OCE-5 asked the defendant, "[W]hat if your money goes to help restore Dawlah [ISIS]?" and suggested that "if the sisters escape the camp as im sure many of them probably are and are trying to get back [to ISIS territory]." The defendant responded that he believed the burnings conducted by ISIS were "permissible" and that if the sisters were to escape and try to return to ISIS it would be "fine if they go back to restoring the [ISIS Caliphate]." With respect to funding ISIS, the defendant told OCE-5, "I don't mind. As long as the [ISIS Caliphate] is back [on the] path . . . Then I'm all for it."

In a subsequent conversation in August 2020, the defendant told OCE-5 that he "may not be around for much longer" because "prison or death is one of the possible outcomes for me in the near future." OCE-5 responded by telling the defendant again that OCE-5 "used to support dawlah [ISIS] . . . but also that my feelings about that had changed over time." OCE-5 suggested to the defendant that with respect to the defendant's life ending in prison or death, "you don't have to do it . . [n]ot for their sake . . you don't need to throw away your life." The defendant responded, "As per supporting Dawlah [ISIS]. As of right now, they are the only group of Muslims in the world who seem to be upon the Haqq [truth] . . . we should overlook their mistakes and advise them if we are able."

In July 2020, SA Imran Jones—who was introduced to the defendant by OCE-5 and who is identified in discovery as UCE-2—met with the defendant for the first time while acting as the "wali," or male guardian, of T.M. The purpose of the meeting, which was audio recorded, was for UCE-2 to vet the defendant as a potential marriage suitor for T.M. The defendant readily provided UCE-2 with a lengthy explanation of his history, focusing especially on his involvement with law

enforcement, and expressing admiration for jihadi ideologue Anwar al-Awlaqi. According to the defendant, in "early 2019" he had started sending money to the "sisters in the camps" in Syria as well as sending money to women in the Philippines. The defendant impressed upon UCE-2 that he considered supporting the sisters to be deeply important to him, and law enforcement's execution of a search warrant on his house was evidence that he was "on the right path." Additionally, the defendant insisted he would not "abandon the sisters," and that when it came to "anything to do with the sisters or in Syria or Turkey, people automatically say terrorist terrorist terrorist, but even if they are a terrorist, even if they're the worst person in the world, as long as they're a Muslim brother or sister…" before he was interrupted by UCE-2, the implication being he would continue to support the ISIS sisters.

UCE-2 met with the defendant once more, in October 2020, after the defendant and T.M. were no longer exploring the possibility of marriage. As a result, during this meeting UCE-2 was no longer acting as a wali. Instead, the defendant shared detailed instructions and explanations of NordVPN, Telegram, and other encrypted messaging platforms or online obfuscation techniques to disguise internet activity and evade law enforcement scrutiny. At one point, the defendant told UCE-2 that Telegram's "secret chat" function was so useful, it had kept the bulk of his incriminating chats from being disclosed to the FBI, and "if they really had that, I'd be in prison right now, let's just put it that way … I'm not doing anything wrong but there's some conversations where it got… you know, more sensitive."

    iii.    CHS-6 (Nadia Edwards) and CHS-9 (Dylan Wright)

In approximately January of 2020, Nadia Edwards (CHS-6 in discovery) contacted UCC-1 after another Telegram user connected them. CHS-6 helped UCC-1 get in touch with her in-laws, then located in Bowling Green, Kentucky. UCC-1 pressed CHS-6 to assist in a variety of ways

with financial transfers, but CHS-6 demurred for safety reasons. CHS-6 introduced another source, Dylan Wright (identified as CHS-9 in discovery), to facilitate a transfer, wherein she would send the money to CHS-9 and he would send the money on.

CHS-9 began speaking with UCC-1 in April 2020 Conversations, and later on other messaging applications, including Telegram. In their initial conversation, UCC-1 described herself as having recently escaped from a camp, "living undercover," and as one of the "women of da3sh [ISIS]" living with other women who "are dawla [ISIS]." UCC-1 made clear during their conversations that money sent to her and the other ISIS women in her area would be funneled first through ISIS brothers. UCC-1 indicated in subsequent conversations that the facilitator who utilized her bitcoin wallet on her behalf was a trusted ISIS member involved in combat. She also described her time with ISIS as the best five years of her life.

In December 2020, UCC-1 asked CHS-9 if an associate of CHS-9 could help to "hack PayPal accounts of kuffar [non-believers]." CHS-9 asked where any stolen funds should be sent, and UCC-1 answered that, "Dawla [ISIS] has contacts everywhere." During that conversation, UCC-1 told CHS-9 he could be useful to ISIS by staying where he was and helping to collect money, explaining, "If you are able to help [from] your place by gathering money it is better you stay and continue. If there is some special skill required for the jihad and the brothers are in need of it then we can see about sending people places." UCC-1 also expressed interest in assisting CHS-9 with "attack planning in the west," including by helping procure materials for making explosive devices.

In March 2021, UCC-1 contacted CHS-6 and said, "I collect money for the sister [sic] in the camp and send them u know. And most people they send it to paypal and from PayPal we would have the bro send it to the bitcoin in another country in Europe and after it would be taken

by hand sent to the camp for the sisters. But the brothers paypal stopped working. And we need someone to receive the money in PayPal and then if you live close enough the bro I know can pick it up from you by hand and send it himself to our bitcoin." UCC-1 then made a group chat with the defendant, wherein UCC-1 suggested "maybe u can like put it in a bag that looks like it has shopping and food in it like those grocery bags." CHS-6 did not agree to help, ostensibly out of fear of inputting her social security number to PayPal and being detected by law enforcement.

On March 17, 2021, CHS-9 shared with UCC-1 a screenshot of a communication between CHS-9 and CHS-6 discussing the defendant as a "brother who had an account and it stopped working and he sends donations so he needs a new account." UCC-1 explained that the defendant would receive donations from CHS-6 who would then "send to our bitcoin." CHS-9 asked UCC-1 for clarification as to whether the defendant also helped with the "brothers" or only the "sisters," and UCC-1 explained that the defendant did both. CHS-9 asked if the defendant was also willing to help the "ikhwa [brothers, or ISIS fighters]" to which UCC-1 responded, "100%" describing the defendant as "helping brothers and sisters for a long time . . . he is of those who are foremost in such good deeds."

iv.    CHS-5 (John Smith)

In early October 2022, John Smith, identified as CHS-5 in discovery, observed a fundraising post for women in the al-Hol detention camp in Syria and messaged the Instagram account @umm3imaarah to inquire about donating. This Instagram account is in the same naming convention as multiple others used by UCC-1,[3] and the phone number used to register the account is one previously used by the defendant to contact incarcerated inmates in the United States.

_____

[3] A business records provided by Instagram showed six accounts in the name Umm Imarah linked by cookie on the same android device used by UCC-1.

Because it is the same name ("Umm Imarah"), the same modus operandi (fundraising using cryptocurrency for Al Hol), and because the defendant appears to have facilitated the creation of the account by registering the account with a phone number previously used by him, the government believes this is the same Umm Imarah that is the defendant's co-conspirator. @umm3imaarah moved the conversation to Telegram, where she used the same username and display name "Umm Imaarah." During this first Telegram conversation, Umm Imaarah sent CHS-5 two cryptocurrency accounts to receive funds and told CHS-5 that she could send money to the "brothers" on the "battlefronts" in "sham [Syria] and iraq." A few days later, Umm Imaarah told CHS-5 to message her new Telegram account, @ummimaarah, which had the display name "..". When CHS-5 told her that the money was "for the Mujahideen," she agreed and sent CHS-5 a screenshot of an ISIS receipt showing that "Umm Imaarah" had provided $3,400 to ISIS. She added, "This is proof," "I sent before to ikhwa [brothers]," and "It said my name on it." Umm Imaarah also told CHS-5 that she would most likely send the money to "shaam [Syria]." CHS-5 never ultimately sent Umm Imaarah money, and ceased messaging with her after she became angry with CHS-5's questions about the security of the cryptocurrency accounts and whether the cryptocurrency wallet owner was trustworthy.

     v.       Marriage to Allison Fluke Ekren

In December 2021, the defendant discussed with his brother how "one sister messaged another sister" asking if someone in the United States could help her and adopt her six children. The defendant and his brother discussed what if the defendant should marry the woman and take on the care of the children. The defendant's brother told him, "if you marry a mujahid, how much honor and reward and blessing it is." They discussed what the adoption proceedings will be like, with the defendant's brother stating, "we have to be smart with these kuffar…we have to sound all

liberal and moderate and all that crap…we have to appear that way…we don't agree with ISIS and all that…we have to make that image." Around the same time period, the defendant began emailing American Citizen Services ("ACS") at the U.S. embassy in Ankara, Turkey. The defendant provided a Syrian marriage certificate claiming he was married to Allison Fluke Ekren and stating that he wanted to adopt her children. The defendant then called the FBI from the 224-877-4019 phone number. The FBI called him back and recorded the call, wherein the defendant stated, "There's a women being held in the Syrian camps, her name is Allison Elizabeth Fluke Ekren…she was told recently she was going to be deported back to the U.S….I married her so I can hopefully take care of her kids in the event that she is possibly like uh going to prison or something." Shortly thereafter, the defendant was informed by ACS that Fluke-Ekren and her six children were deported to the United States on January 28, 2022. The defendant attended her guilty plea and her sentencing. At her guilty plea, the defendant watched as Fluke-Ekren admitted that while residing in Syria, she told a witness about her desire to conduct an attack in the United States. Fluke-Ekren also admitted to being the leader of a woman's center in Raqqa, Syria, that provided and assisted other female ISIS members with providing training to numerous women and young girls (including as young as ten years old) in the use of firing AK47 assault rifles, grenades, and explosive suicide belts to defend themselves against ISIS's enemies.

    vi.        Financial Records

      The government will introduce financial records obtained during the course of FBI's investigation from Apple Federal Credit Union, Coinbase, Gemini, Binance, Paypal, and Paysafe (Skrill). These records show that following the defendant's receipt of cash from undercover officer UCE-3 on August 15, 2021, October 28, 2021, November 18, 2021, and January 13, 2022. The defendant made cash deposits within one or two days later into his Apple Federal Credit Union

account, and was captured on surveillance footage doing same. The records show that in the days following these cash deposits, the defendant transferred the funds from his Apple Federal Credit Union account into his Coinbase Account and purchased Bitcoin. The defendant then transferred the purchased Bitcoin to various other Bitcoin addresses. In each instance, within two weeks of the transfer, UCC-1 confirmed receipt of the funds.

The financial records also show that between October 2019 and October 2022, the defendant's cryptocurrency accounts sent approximately $185,477 in cryptocurrency to other cryptocurrency addresses, including approximately 100 transfers to the same addresses to which the defendant's bitcoin was transferred following his meetings with UCE-3, and approximately 80 transfers that either directly or through intermediaries were sent to cryptocurrency wallets with IP addresses resolving to Turkey. The financial records also show that a substantial portion of the funds deposited into bank accounts for which the defendant was either the primary or joint account holder originated from Paypal or Skrill, digital money services businesses.

vii.      2023 Search Warrant

In 2023, the FBI executed a search warrant on the defendant's residence, located at XXXX Kingsford Road, Apartment X, Springfield, VA, 22152. The defendant was arrested there. The government intends to introduce evidence from one memory stick and one phone seized in the residence. The government will introduce a few exhibits from each that indicate that the defendant was the user of the device. The government will introduce from the phone a PDF guide explaining "How to Help Our Sisters?" This guide is designed to "mak[e] a way or a network to get the money from you, straight to our sisters (eventually) through a series of conversions and transfers without any issues all the while trying our best to maintain anonymity, our own safety, and minimizing the risks." The government will also introduce Bitcoin transaction receipts, screenshots of a

conversation where the defendant is verifying that certain "sisters" are "from Dawlah [ISIS]," pictures of "Umm Imarah" and "@saabiruwaraabitu" (a name and handle used by UCC-1) holding money received for al-Hol camp, a picture of money in the desert with the defendant's Telegram channel name written next to it, a ledger with money designated for "Umm Imarah" and others. On the memory stick, the government will introduce several pictures depicting ISIS members and flags, including an image of five women, fully covered in black, holding guns and an ISIS flag; additional ledger information, including money going to Umm Dujaanah (another alias used by UCC-1), a document labeled "hacking tips on how to hide your ip and cover your tracks," and login information for the defendant's accounts.

C.    <u>Substantive Counts 2 through 5: Providing and Attempting to Provide Material Support or Resources</u>

In August 2021, S.A. Alexandra Weaver (identified as UCE-3 in discovery), who had assumed CHS-6's online persona, contacted UCC-1 over Telegram and told her, "I have some money to send over but not sure about the safest way." UCC-1 suggested, "You can send it to the bro who lives in Virginia? And he will send me thru bitcoin." UCC-1 then provided the defendant's Telegram handle, and UCE-3 messaged him there. When discussing the safest way to transfer him money, the defendant stated, "You don't want any tracks right? …the safest way is for a meeting…I travel to other states for this same purpose, cuz obviously you're in the U.S. so you need to be extra careful, you don't want to be linked to me in any way possible." They discussed dead drop scenarios to deliver the money, but the defendant stated it was important to meet to establish trust. The defendant went on to say, "if it's a sister in the camp, and she's telling me to do this, meaning Umm Dujana [alias for UCC-1] is the one who referred me to you, so it's on her, if you turn out to be like one of the 40 year old American FBI agents, fat American FBI agent, then it's on her…I'm not saying I'm scared or anything…even if you are, I don't care I'll go to

prison." In a private chat, UCC-1 asked UCE-3, "And remind me, you want it for the sister in the camp? Or for the muj." UCE-3 responded, "I like the idea to split between sisters and muj," and then also that she would add $50 to help with UCC-1's living expenses.

On August 15, 2021, the defendant met UCC-1 at a Whole Foods located at 7511 Leesburg Pike, Falls Church, VA. The meeting was audio recorded (UCE-3 had a video recording device but was unable to place it in a position to obtain much usable footage), and the FBI obtained surveillance footage from Whole Foods as well. UCE-3 and the defendant met in the parking lot and sat together in the cafeteria. The defendant told UCC-1 that he was not followed and that he had taken precautions in arriving there (*i.e.*, to evade surveillance). When UCE-3 went to pass him the money, the defendant said, "usually people will give it … in a cover or something so no one knows," prompting UCE-3 to conceal the $300 inside a magazine and pass it to him. The defendant is seen on video taking the money out of the magazine and placing it in his pocket. Later that day, the defendant deposited money into his ATM (as captured on ATM video camera footage) and sent a cryptocurrency transfer. The following day, UCC-1 confirmed receipt of the money.

Following that transfer, the defendant and UCE-3 discussed that it was impermissible Islamically for a man and a woman to be meeting alone, and the defendant stated he would be bringing his mother to subsequent meetings. In a three-way chat with UCC-1, the defendant and UCE-3 arranging to meet again on or about October 28, 2021, in the parking lot of Idylwood Plaza shopping center, located at 7511 Leesburg Pike, Falls Church, VA. In the three-way chat just prior to the meeting, UCE-3 wrote, "sorry not as much as last time but I have not been working. Maybe someone needs it more and u can send it all there?" UCC-1 responded, "Okay I'll put it aside for the brs." The defendant sat in the car while UCE-3 talked with his mother and provided her with $120 hidden amongst pastries. The defendant made an ATM deposit (as captured on ATM video

camera footage) and a cryptocurrency transfer shortly thereafter. UCC-1 confirmed receipt of the money a few days later.

In November 2021, UCE-3 arranged for another financial transfer to the defendant and onto UCC-1. In the three-way group chat, on or about November 18, 2021, UCE-3 said, "I have $260…100 for sisters 100 for muj [mujahideen, or fighters] and then you keep 60…" The defendant met UCE-3 approximately a half hour later at the Idylwood Plaza shopping center, located at 7511 Leesburg Pike, Falls Church, VA. The defendant sat in his car while UCE-3 gave the money in a sealed envelope to the defendant's mother. Shortly thereafter, the defendant made a deposit at the ATM (as captured on ATM video camera footage) and sent a cryptocurrency transfer. On or about November 21, 2021, the defendant messages UCE-3 and said, "in like 1-2 days after Umm Imarah [alias for UCC-1] reads these messages then can you please delete the conversation on your end on this chat and we'll start a whole new group?" The defendant then pinned the message where UCE-3 stated, "100 for sisters 100 for muj" and said, "The reason I say to start a new group is because of messages like this…Be careful in the future." The defendant went on to state, "let @shokhbarij [telegram handle for UCC-1] read these messages first and then we'll start a new one and … be very careful in the future and or just discuss with the sister in private regarding the allocation of the amount." On or about November 24, 2021, UCC-1 confirmed that she had received the money.

On or about January 11, 2022, UCE-3 contacted UCC-1 to say she had some more money to send. UCC-1 said she would send the money "to the mj" [mujahideen], but, per the defendant's instructions, he was not told in the group chat how UCC-1 would distribute the money. UCE-3 and the defendant met up again at 7511 Leesburg Pike, Falls Church, VA on or about January 13, 2022. UCE-3 passed the defendant's mother $160 while the defendant remained seated in his

vehicle. On or about January 15, 2022, the defendant made a deposit at his ATM (captured on video surveillance). One or about January 26, 2022, UCC-1 informed UCE-3 that "[the brothers] were fighting for 7 days while hungry and weak and injured with very little supplies of weapons. And today they surrendered. But alhamdulillah a group managed to escape." UCE-3 replied, "I feel helpless like I am not doing enough…did you get the $ I sent a few weeks ago? I trust the bro but don't know what happens to it after him.' UCC-1 responded, "Yes it came to me. And I will send for the mj [mujahideen]."

## II.    STATUS OF THE CASE

On May 24, 2023, the federal grand jury sitting in Alexandria, Virginia, returned a five-count indictment charging the defendant with a conspiracy from December 2020 through at least in and around February 2022 to provide material support to a designated foreign terrorist organization (FTO), to wit, ISIS, in violation of Title 18, U.S.C. § 2339B (Count 1); the provision and attempted provision of material support to a designated FTO, to wit ISIS, from on or about August 15, 2021 to on or about August 16, 2021, in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2 (Count 2); the provision and attempted provision of material support to a designated FTO, to wit ISIS, from on or about October 28, 2021 to on or about November 3, 2021, in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2 (Count 3); the provision and attempted provision of material support to a designated FTO, to wit ISIS, from on or about November 18, 2021 to on or about November 24, 2021, in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2 (Count 4); and the provision and attempted provision of material support to a designated FTO, to wit ISIS, from on or about January 13, 2022 to on or about January 26, 2022, in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2 (Count 5). On or about August 15, 2024, a superseding indictment was returned with the same charges but expanding the dates of the conspiracy charged in Count 1 to from at least in

and around October of 2019 and continuing through at least in and around October of 2022. The defendant is in custody pending trial.

The parties have complied with discovery and motions deadlines. Expert disclosures are due on November 14, 2024.

## III.    ESSENTIAL ELEMENTS OF THE CRIMES CHARGED

A. <u>Count One: Conspiracy to Provide Material Support to a Foreign Terrorist Organization</u>

The essential elements required to be proven in order to establish a conspiracy to provide material support to a designated foreign terrorist organization, in violation of Title 18, U.S.C. § 2339B, as charged in Count 1 of the superseding indictment, are:

1) That two or more persons entered into an agreement that had as its objective providing material support or resources to a foreign terrorist organization;

2) That the defendant knowingly and voluntarily became a part of that agreement; and

3) That the defendant knew that the organization was a designated terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism.

B. Counts 2 – 5: Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization

The essential elements required to be proven in order to establish that the provision or attempted provision of material support to a designated foreign terrorist organization, in violation of Title 18, U.S.C. § 2339B, as charged in Counts 2 through 5 of the superseding indictment, are:

1) That the defendant provided or attempted to provide material support or resources to a foreign terrorist organization;

2) That the defendant acted knowingly; and

3) That the defendant knew that the organization was a designated terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism.

## IV.    RELEVANT CASE LAW AND POTENTIAL LEGAL ISSUES

In addition to the issues briefed in three motions *in limine* submitted by the government—use of co-conspirator statements, admissibility of intrinsic and/or 404(b) evidence, and the inapplicability of the entrapment defense—the government wishes to highlight the following.

A. Use of Summary Charts

The government intends to introduce four charts to summarize the social media accounts used in this case. The defendant and UCC-1 used multiple accounts due to repeated bans by social media companies and for operational security. Many of the account names will be foreign and unfamiliar to most jurors, and the number of accounts could be confusing. Therefore, the government intends to introduce a summary chart for the key Facebook, Instagram, and Telegram accounts utilized by the defendant and by UCC-1 after the government has presented evidence that they were the users of these accounts. Similarly, the government also intends to introduce summary charts explaining how the defendant's and UCC-1's accounts are tied back to them.

Pursuant to Federal Rule of Evidence 611(a), parties may use summaries or charts "to facilitate the presentation and comprehension of evidence already in the record." *United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) ("Rule 611(a) charts are not evidence themselves; they are used merely to aid the jury in its understanding of the evidence that has already been admitted, by, for example, revealing inferences drawn in a way that would assist the jury.") (internal quotation marks omitted). In deciding whether to admit the charts, a district court should first examine whether the summary chart aids the jury in ascertaining the truth. *United States v. Johnson*, 54 F.3d 1150, 1158 (4th Cir. 1995). "In making this determination, we look to the length of the trial, the complexity of the case, and the accompanying confusion that a large number of witnesses and exhibits may generate for the jury." *Id.* Next, the Court considers if any undue prejudice could result, with the availability of the witness who prepared the chart and the admission

23

of the underlying documents, along with a proper jury instruction, typically minimizing any undue prejudice. *Id.* The government submits that such charts would be a helpful aid to the jury and has submitted them to defense counsel on November 11, 2024. Moreover, an agent who participated in the preparation of the chart will testify, and the underlying exhibits will be admitted as well. The charts are attached as Exhibit A.

The government also intends to introduce three charts to document the movement of money in this case. The first depicts the movement of money after each of the undercover transactions. The second depicts the movement of money over the course of the charged conspiracy, from October 1, 2019, through October 31, 2022. The third is a summary chart of income/deposits made into the defendant's Apple Federal Credit Union account over the same three-year time period. The government will introduce all of the underlying bank records, cryptocurrency exchange records, and other financial records pertaining to the defendant that were the basis for making these charts. FBI forensic accountant Susan da Silva will testify to reviewing those records and preparing the summary charts to facilitate the presentation and comprehension of the evidence already in the record due to the complexity of the underlying financial records. Similar versions of these charts have been produced in discovery, along with all of the underlying financial records, several months ago. The finalized versions were provided to the defense on November 8, 2024. The financial charts that the government proposes to admit into evidence are attached as Exhibit B.

Federal Rule of Evidence 1006 permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The First Circuit's opinion in *United States v. Milkiewicz*, 470 F.3d 390 (1st Cir. 2006), is instructive. In that case, the court held that Rule 1006 summaries may be admitted "in addition to the underlying documents to provide the jury with easier access

to the relevant information." *Id*. at 397. In such instances, "Rule 1006 still serves its purpose of allowing the jury to consider secondary evidence as a substitute for the originals" that cannot be "conveniently examined in court." *Id.* The *Milkiewicz* court also "clarif[ied] the landscape" surrounding the admission of summaries, noting that other rules—such as Rule 611(a), which gives the trial court "control over the mode…[of] presenting evidence" to assist in the determination of truth and avoid wasting time—are not "mutually exclusive" with Rule 1006. *Id.* at 395. As such, the court explained that summaries falling short of the technical requirements of 1006 may nevertheless be admissible under Rule 611, or a hybrid of Rules 611 and 1006. *Id*. at 397; *United States v. Johnson*, 54 F.3d 1150, 1158 (4th Cir. 1995); *United States v. Ray*, 370 F.3d 1039, 1047 (10th Cir. 2004), vacated on other grounds, 543 U.S. 1109 (2005); *United States v. Pinto*, 850 F.2d 927, 935–36 (2d Cir. 1988); *United States v. Scales*, 594 F.2d 558, 563-64 (6th Cir. 1979).

Because of the voluminous nature of the financial records, the complexity of cryptocurrency transactions involving wallets identified only by a lengthy stream of characters, and the extended period of time over which the conspiracy took place, the government is seeking to admit these charts as substantive evidence under Rule 1006.

B. Use of Expert Witnesses[4]

1. Dr. Aaron Y. Zelin

The government intends to call three expert witnesses. The first is Dr. Aaron Y. Zelin, who will explain to the jury the history and goals of ISIS, including ISIS's well-publicized use of extreme violence and acts of terrorism—such as videotaped beheadings of hostages and other public executions—to achieve those goals. Dr. Zelin will explain some of ISIS's propaganda, like

---

[4] The government is turning over more fulsome expert disclosures on or before November 14, 2024. Below are merely summaries.

its official English-language magazine, Dabiq, and the video production houses al-Hayat and al-Furqan. Dr. Zelin will also testify about ISIS's organizational structure and bureaucracy, especially as pertaining to the women of ISIS. Dr. Zelin will opine that the ISIS receipt sent to CHS-5 by Umm Imaarah appears to be genuine because of its language, date, stamp, and other visual clues.

Dr. Zelin will further describe ISIS's views on the role of women in the organization, including women as stewards of the next generation and fighters, and they ways in which ISIS's patriarchal opinion drives the organization to pursue freeing female prisoners from detention camps.

As part of his explanation of ISIS, Dr. Zelin will describe certain prominent jihadist and ISIS figures, such as Usama bin Laden, Abu Mus'ab al-Zarqawi, Anwar al-Awlaqi, and Abu Bakr al-Baghdadi, and their influences on and roles within ISIS. He will also describe certain prominent female ISIS members like Allison Fluke-Ekren and their roles in ISIS.

Dr. Zelin will further testify about certain geographic areas relevant to this case, including the town of Baghouz, Syria, which was considered ISIS's last territorial stronghold in early 2019. Dr. Zelin will also describe the al-Hol camp in Syria, which hosts tens of thousands of women and children and, specifically, female ISIS members considered to be the most extreme and dedicated to the organization. These extreme ISIS women are segregated in an especially secure portion of al-Hol, where they impose strict sharia law according to ISIS's beliefs and violently punish rulebreakers. Dr. Zelin will explain that ISIS works to free the most dedicated female supporters so that they can continue to raise the next generation of ISIS members and fighters, and continue the fight for the caliphate. Finally, Dr. Zelin's testimony will include the definitions of certain Arabic words and terms, and specifically how those terms relate to and are used by ISIS.

The government intends to seek to conditionally admit and publish several exhibits during Dr. Zelin's expert testimony. Because the government anticipates that Dr. Zelin will testify among the first witnesses, the relevance of these exhibits to the defendant, and their authenticity or source may not be established yet. Federal Rule of Evidence 104(b) permits the Court to conditionally admit evidence that depends on the existence of a particular fact, subject to that fact later being presented. *See Huddleston v. United States*, 485 U.S. 681, 689–91 (1988) (upholding the conditional admissibility of Rule 404(b) evidence subject to relevance); *United States v. Lopez*, 860 F.3d 201, 217 (4th Cir. 2017) (upholding trial court's conditional admission of DNA testing results); *United States v. McCormick*, 565 F.2d 286, n. 5 (4th Cir. 1977) ("A district court may, in its discretion, … 'permit the introduction of evidence as to things said and done by an alleged co-conspirator subject to being connected up and followed by evidence of the existence of the conspiracy.'") (quoting *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir. 1973)).

In this case, Dr. Zelin's testimony will provide the jury with context critical to understanding and interpreting the importance of certain documents possessed by the defendant and UCC-1, as well as statements by the defendant and UCC-1. For example, the ISIS receipt sent by UCC-1 to CHS-5 is admissible as a co-conspirator's statement during and in furtherance of the conspiracy, as UCC-1 provided it as proof that money sent to her goes to support ISIS. *See* Fed. R. Evid. 801(d)(2)(E). It is therefore appropriate for the Court to conditionally admit this exhibit, and others obtained from the defendant's devices and social media accounts, during Dr. Zelin's testimony so that he can explain their ISIS-specific significance and meaning to the jury, subject to the government later establishing the relevance of those exhibits as to the defendant himself. *See* Fed. R. Evid. 104(b).

2. Forensic Accountant Susan da Silva

The government also intends to call Forensic Accountant Susan da Silva and qualify her as an expert in forensic accounting and cryptocurrency. Although the government does not believe that Ms. da Silva's testimony regarding the movement of cash and virtual currency in the defendant's financial accounts qualifies as expert testimony under Rule 16(a)(1)(G), out of an abundance of caution, the government has provided the defense with an expert disclosure for Ms. da Silva and is prepared to qualify her as an expert.

3. Linguist Mohamed Adra

Absent a stipulation, the government also intends to call FBI linguist Mohamed Adra. He is an expert in Arabic to English translation, and has been previously designated as such in the Eastern District of Virginia. Although the defendant does not speak Arabic, he uses numerous Arabic terms in his communications, as does UCC-1. The expert will explain the meaning of these terms, to verifying the Arabic words in transcripts and translations, and to transliterating names (*i.e.*, writing a proper noun in Latin script rather than Arabic).

The government is not having Mr. Adra translate all Arabic terms used in communication with the undercover personnel. Instead, these undercover personnel will testify to what they understood these terms to mean in the context of their conversations with the defendant and/or UCC-1. Under Rule 701, a lay witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness…" Fed. R. Evid. 701. A rational perception is one involving "first-hand knowledge or observation." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). As a result, co-conspirators and undercover personnel have routinely been found to be able to interpret their own conversations with the defendant. *See, e.g.*, *United States v. Smith*, 833 Fed. Appx. 516, 520–21 (4th Cir. 2020) (government not required to qualify undercover agents as experts before asking them to testify

about the meaning of drug slang used in conversations where they personally participated); *United States v. Akins*, 746 F.3d 590, 599 (5th Cir. 2014) ("testimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation"); *United States v. Yannotti*, 541 F.3d 112, 125–26 (2d Cir. 2008) (co-conspirator testified as lay witness to meaning of loansharking terms used by defendant); *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014) (in securities fraud case, undercover agent permitted to interpret what he and defendant meant in recorded conversations where basis for interpretation comes from officer's personal involvement in the case); *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) (upholding admission of agent's lay opinion of code words used by defendants in intercepted telephone calls where interpretation was rationally based on agent's perception of review of thousands of wiretap calls).

C. <u>The Defendant's Intent Regarding How Funds Were Used by ISIS is Irrelevant</u>

The government anticipates that the defendant may argue that the money sent was somehow humanitarian in nature, intended for medical care or basic necessities. Such an argument is misplaced. In enacting § 2339B, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (quoting the Antiterrorism and Effective Death Penalty Act of 19956 (AEDPA), § 301(a)(7)). Even material support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways. *Holder*, 561 U.S. at 30. "Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups … all of which facilitate more terrorist attacks." *Id.* (further noting that FTOs do not have organizational firewalls, so support and benefits may be shared and commingled).

*Holder* also specifically noted that FTOs systematically conceal their activities behind charitable, social, and political fronts. *Id.* (*quoting* M. Levitt, Hamas: Politics, Charity, and Terrorism in the Service of Jihad 2–3 (2006)). FTOs may try to highlight civilian and humanitarian ends to which money could be put in order to raise funds, but there is nothing stopping that money ultimately being used to support violent, terrorist operations. *Id.* at 31. As a result, the Fourth Circuit rejected arguments that financial support given to an FTO might thereafter have been used to purchase medical equipment or supplies as irrelevant. *United States v. Dhirane*, 896 F.3d 295, 303 (4th Cir. 2018).

In sum, the defendant is charged with conspiring to provide, providing, and attempting to provide money to the FTO ISIS, and any argument that he intended the funds for ISIS, but for non-violent purposes, is not relevant.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

_____/s/_____
Anthony T. Aminoff
Amanda St. Cyr
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
anthony.aminoff@usdoj.gov
amanda.st.cyr@usdoj.gov

Andrew J. Dixon
Andrea Broach
Trial Attorneys
Counterterrorism Section
National Security Division, Dept. of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of November, 2024, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system.


_____/s/_____
Anthony T. Aminoff
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov