IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>MOHAMMED AZHARUDDIN CHHIPA,<br><br>    Defendant. | Case No. 1:23-CR-97<br><br>Hon. David J. Novak |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits that the only just sentence in this case is a lengthy period of incarceration. The defendant is a fervent follower of the Islamic State (ISIS). He has, for years, advocated for this foreign terrorist organization (FTO) and on behalf of its terrorist activities. He possessed troves of their official documents and literature, including guides on how to wage jihad in the West and how to operate as a "sleeper cell." And crucially, he fundraised on the FTO's behalf, sending over $185,000 during the charged conspiracy, and even more money before that, to ISIS terrorists. The defendant is an unregenerate and, until his arrest, active supporter of this vicious terrorist organization that slaughters, enslaves, and oppresses people simply because their religious beliefs differ from their own. He was given every opportunity to stop his criminal activities but refused; only an arrest paused his activities, and only a lengthy period of incarceration will prevent him from providing additional support in the future.

The advisory Sentencing Guidelines, as correctly determined by the Probation Officer, call for a sentence of 360 to 1200 months (30 to 100 years) imprisonment.[1] To account for the

---

[1] The statutory maximum reduces the maximum term of imprisonment from life imprisonment to 100 years. *See* U.S.S.G. § 5G1.1(a). Because no count carries an adequate statutory maximum, the guidelines call for consecutive sentences to be imposed to the extent necessary to achieve the total punishment. See U.S.S.G. § 5G1.2.

1

defendant's own history and characteristics, to provide just punishment, to protect the public from the defendant himself, to disrupt his multi-year support for terrorist organizations, and to adequately deter others who would support terrorism and do us harm, the defendant should receive a Guideline sentence.

## I.      The Sentencing Guidelines

### A.  The Base Offense Level of U.S.S.G. § 2M5.3

U.S.S.G. § 2M5.3 provides for a base offense level of 26 for a defendant convicted of 18 U.S.C. § 2339B. That is the defendant's starting point. A 2-level increase is warranted if the offense involved the provision of "funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3(b)(1). This offense characteristic "does not require . . . that support be traced to or be designed to lead to a specific act of violence." *United States v. Dhirane*, 896 F.3d 295, 304 (4th Cir. 2018) (finding that coordination to some degree of their fundraising with al-Shabaab's military operations warranted application of the guideline).

In this case, the defendant had sufficient reason to believe that the funds he was transmitting would be used to commit or assist in the commission of a violent act. The standard of proof for this specific offense characteristic, and all other guideline findings, is a preponderance of the evidence. *See United States v. Grubbs*, 585 F.3d 793, 802 (4th Cir. 2009) ("Preponderance of the evidence is the appropriate standard of proof for sentencing purposes.").

The defendant most clearly had sufficient reason to believe that the funds he transmitted would be used to assist in the commission of a violent act when he knowingly transmitted money designated for the *mujahideen*, or fighters of ISIS, on at least two occasions. *See, e.g.*, Gov Exh. 8-21 (S.A. Weaver wrote in group chat with defendant, "100 for muj"). The defendant understood

the gravity of labeling funds for use by ISIS fighters, so he instructed S.A. Weaver that in the future, she and the defendant's ISIS co-conspirator, Umm Dujana, should work out privately with each other how the funds would be used, rather than expose him. *See* Gov. Exh. 8-26 ("just discuss with the sister in private regarding the allocation of the amount"). Furthermore, ISIS itself was actively engaged in the use of violence during the time the defendant was transmitting money. *See, e.g.*, Transcript of Trial, Day 1, at 49 (noting that following the loss of its physical territory, ISIS exists as an insurgency inside Syria). The defendant was well aware of this fact. *See, e.g.*, Gov. Exh. 2-167 (phone call where defendant stated to his brother, "Irfan, man, very good news … the mujahideen … they just raided the biggest prison in Syria … and they're releasing all the brothers … they killed the jailer … and the fight is still ongoing, right now.").

In addition, as discussed more fully below, the defendant knew of and celebrated the role that women played in ISIS, specifically hailing their engagement in violent combat on the FTO's behalf. He specifically sought out these ISIS women and sent money to break them out of prison camps, knowing that they would go back to the Islamic State once free and thus replenish the FTO's ranks. *See, e.g.,* Gov. Ex. 4-9 at 10 ("if I have a choice (like I do now) then obviously [I send financial support to] sisters who support dawlah."); Gov. Exh. 4-11 at 11 (the defendant states that once free again, where else would the women go but back to ISIS).

The defendant thus had every reason to believe that the funds he was transmitting were to be used to commit or assist in the commission of a violent act, particularly when he was transmitting funds explicitly labeled for ISIS fighters.

B.  The Terrorism Enhancement

The terrorism enhancement, U.S.S.G. § 3A1.4, requires an additional 12 levels, as well as an increase in the criminal history to Category VI. The enhancement applies if the offense of

3

conviction is a felony that involved, or was intended to promote, a federal crime of terrorism. Application Note 1 provides that a "federal crime of terrorism," for purposes of this guideline, is defined in 18 U.S.C. § 2332b(g)(5), which states, in relevant part:

> (5) the term "Federal crime of terrorism" means an offense that –
>
>> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>>
>> (B) is a violation of –
>>
>>> (i) … 2339B (relating to providing material support to terrorism organizations).

In other words, the evidence must be such that the Court could "reasonably infer by a preponderance of the evidence that [the defendant] intended to advance [the group's terrorist] purpose in providing material support." *United States v. Young*, 818 Fed. Appx. 185 (4th Cir. 2020) (quoting *United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012)).

As testified to by Dr. Zelin, "ISIS's primary goal is to control territory throughout the whole globe … and to implement Islamic law based off of their interpretation of it." Transcript of Trial, Day 1, at 11. And during the time periods relevant to this case, ISIS was actively engaged in an insurgency against the (then) government of the Assad regime and the U.S.-backed Syrian Democratic Forces (SDF), as well as in conducting attacks in different parts of the world. *Id.* at 25, 49, and 85. As laid out in the defendant's edition of Dabiq magazine (the ISIS official publication recovered by the FBI from the defendant's home), terror attacks in the West are retaliation for bombing ISIS's caliphate. Gov. Exh. 2-33 at 4. The magazine goes on to state that Islamic State operations, "conducted by the mujahidin," serve to "[expand] the territory of the khilafah, or [terrorize], [massacre], and [humiliate] the enemies of Allah." *Id.* at 20. In other words, ISIS's goals and actions—conquering territory and punishing Western countries for impeding its

4

growth—are clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Conquering territory is literally coercing governments into giving up land, and punishing the West is meant to retaliate against them for the counter-terrorism actions being taken.

The defendant understood these goals of ISIS, as described in the Dabiq magazine recovered from his home. The defendant's obsession with and deep understanding of ISIS is visible from the huge number of social media posts he made in support of the organization. His support for their terroristic activities is clear from his defense of ISIS atrocities (*see* Gov. Exh. 4-13 at 28, defending the burning alive of a Jordanian pilot; Gov. Exh. 2-167, defending the killing of jailers and supporting the release of ISIS members from prison), and his possession of terrorist pamphlets (s*ee* Gov. Exh. 2-21, *How to Survive in the West: A Mujahid Guide*; Gov. Exh. 2-23 at 15, *Jihad Without Borders: Attacks in the West from an Islamic Perspective*; Gov. Exh. 2-24, *The Explosives Course*), among other things. The defendant has actively advocated for a restoration of the ISIS caliphate. *See, e.g.,* Gov. Exh. 2-18 ("It is our job to create a country like this … we don't have an Islamic State, or we do, but they are being bombarded … so we need Muslims to rise up and create these places."). The evidence thus established that he supports the goals of ISIS, including its conduct that is calculated to intimidate, coerce, and retaliate against governments.

The evidence further established that the defendant's material support for ISIS, *i.e.*, the financial transactions that he engaged in, were intended to promote ISIS's terroristic goals. First, the defendant provided money to the mujahideen—the male fighters—of ISIS. Umm Dujana repeatedly stated that he did so, and the defendant actually sent money from S.A. Weaver on two occasions when he knew the money was specifically designated for male ISIS fighters. *See* Gov. Exhs. 8-16, 8-21 (3-way chats with S.A. Weaver designating money for ISIS fighters); Gov. Exhs.

5

7-9 at 6–7, 9-8 at 31 (Umm Dujana discussing the defendant supporting male ISIS members). As described in the defendant's edition of Dabiq magazine, the mujahideen are the proverbial tip of the spear in carrying out the terror attacks that further ISIS's goals of terrorizing their opponents and conquering land. These transactions alone should thus qualify the defendant for the terrorism enhancement.

But in addition to funding male ISIS fighters, the defendant also sent money to break ISIS women out of prison camps so that they could rejoin the FTO. The defendant understood that the women of ISIS had a role to play in fighting to restore the caliphate. The defendant repeatedly posted online depicting the women of ISIS fighting in battle and praising them for engaging in jihad. *See, e.g.*, Gov. Exh. 2-81 (post depicting woman firing AK-47 in apparent battle scene, where defendant complains in caption that men are neglecting their duty to engage in physical combat, while women "[stand] in all their bravery to fulfill the duty of men."). He possessed pamphlets that detailed all the ways in which women contribute to jihad and terrorism, including by engaging in actual fighting, and was told by the FBI that the women he supported in the Philippines were arrested with bombmaking materials. *See* Gov. Exhs. 2-20 (A Sister's Role in Jihad), 2-34 (*The Role of the Women in Fighting the Enemies*), 2-14B (packet shown to defendant during Dulles interview containing news article about Joyce Ann Fornal). And he knew that these ISIS women would face severe prison sentences for the crimes they had already committed with the FTO. *See* Gov. Exh. 2-92 (acknowledging the need to break the women of ISIS out of prison camps before they are deported to their home countries and face "life sentences"). He also knew that, once free, these ISIS women would go back to restoring the caliphate. *See, e.g.*, Gov. Exh. 4-11 (the defendant states that once free again, where else would the women go but back to ISIS and the caliphate); Gov Exh. 4-13 (the defendant approves of his money going to restore the ISIS

caliphate). Since the defendant could not be there to fight to restore the caliphate himself, this was *his way* of fighting. As he stated repeatedly, "the one who supports the family of a mujaahid it is like he has fought." *See, e.g.*, Gov. Exh. 4-13 at 25. The defendant mused that once he succeeded, and the ISIS caliphate was restored, he would then make *hijrah*, or immigrate, to ISIS territory. Gov. Exh. 4-13 at 29.

In his written objections to the PSR, the defendant asks the Court to accept the patently pretextual argument that he wanted to "assist a humanitarian crisis." But the evidence at trial has demonstrated that "humanitarian" concerns were a mere fig leaf for providing material support to ISIS. When another Facebook user asked the defendant how he could send money without being "thrown in prison," the defendant told the user to use a middleman so he could "plead ignorance," and he could then claim "the money was going to sisters who are really in need and stuff like this … it was a humanitarian cause and stuff like this." Gov. Exh. 2-107B at 4. He can hardly expect the Court to swallow his "humanitarian" excuse now, especially when so much other evidence of intent demonstrates a desire to support terrorism. The defendant himself stated that he was planning for killing and to do an "operation." Gov. Exh. 4-6. He possessed troves of documents about supporting terrorism, not about humanitarianism. Umm Dujana, one of the defendant's primary financial conduits to ISIS, posted publicly about her support for beheadings, suicide bombings, and the ISIS mujahideen. In short, all of the evidence in this case demonstrates the defendant's desire to support terrorism, with humanitarianism as a transparent cover.

Fourth Circuit caselaw strongly weighs in favor of imposing the terrorism enhancement. In *United States v. Chandia*, the defendant was convicted of material support offenses surrounding (1) a trip to Pakistan where he attended an Lashkar-e-Taiba (LET) training camp, and (2) by helping an LET official during his trips to the United States, including by picking him up at the

airport, providing him access to a computer and e-mail at the defendant's residence, and by assisting the official in shipping paintballs to Pakistan for LET use in military training operations. *Chandia*, 675 F.3d at 332. The Court found that because Chandia "knew LET was an organization that engaged in repeated acts of violence against the government of India," and because Chandia "knew [the LET official] well and that he was much more than an unwitting assistant to this LET leader," the court surmised that Chandia's "intent was to go [to Pakistan] to train and fight," and whether he did so or not, "he possessed a mindset that would make him a valuable asset to the LET." *Chandia*, 675 F.3d at 340. Similarly, the defendant is aware of, and actively supports, the repeated acts of violence committed by ISIS in Syria and elsewhere in the world. He has a close and continuing relationship with Umm Dujana, an ISIS operative and fundraiser who actively attempted to plan a terrorist attack with the CHS who testified under the name Dylan Wright. And again, the defendant is convicted of transmitting money for fighters explicitly on two occasions, and, according to Umm Dujana, having done so on many more occasions than that.

In *United States v. Hammoud*, the defendant led weekly prayer services at his home where he urged attendees to donate money to Hizballah. *Hammoud*, 381 F.3d 316, 326 (4th Cir. 2004). The defendant would then send the money to Sheikh Abbas Harake, a senior military commander for Hizballah with whom the defendant was acquainted. The Fourth Circuit affirmed the application of the terrorism enhancement because of the defendant's "close connections with Hizballah officials" and because he was "well aware of Hizballah's terrorist activities and goals and that he personally supported this aspect of Hizballah." *Id.* at 356. Similarly, the defendant enjoyed a close and trusting relationship with Umm Dujana. Indeed, Umm Dujana, or one of the defendant's other close contacts in Syria, introduced him to Alison Fluke-Ekren, a leader of an all-female fighting battalion in ISIS whom the defendant subsequently attempted to marry. *See* PSR

8

¶ 92. Furthermore, the defendant is well aware of ISIS's terrorist activities and goals and personally supports that aspect of the FTO. And again, he sent money designated for male ISIS fighters on multiple occasions, and a vast sum to ISIS women, whom he exalted for their role in violent jihad.

In *United States v. Young*, the Fourth Circuit upheld the application of the terrorism enhancement because Young believed the $245 Google gift cards that he purchased were, to his knowledge, to be used for ISIS recruitment purposes to recruit additional fighters. *Young*, 818 Fed. Appx. 193–94. As a result, the Court logically inferred that Young (1) knew of and supported ISIS's goals; (2) provided material support to ISIS; and (3) intended to advance those goals in providing such support, and thus applied the terrorism enhancement. *Id.* at 194. Similarly, the defendant here knows of and supports ISIS's goals, and he provided nearly $200,000 worth of support to the FTO. And if providing $245 to recruit fighters qualifies for the terrorism enhancement in *Young*, transmitting nearly $200,000 to either (1) break ISIS members out of prison camps so they can go back to restoring the caliphate, or (2) support the mujahideen, clearly satisfies the requirements of § 3A1.4.

The defendant cites a district court case in Colorado and a Ninth Circuit case to argue that he should not have the terrorism enhancement applied. But the facts in these cases are entirely different from the defendant's. In *United States v. Jumaev*, 2018 WL 3490886 (D. Colo. July 18, 2018), Jumaev was informed by his co-defendant Muhtorov that the Islamic Jihad Union needed financial support. Jumaev, who was in debt to Muhtorov for $500, wrote a single check for $300 and mailed it to Muhtorov, who was by then cooperating with law enforcement. Jumaev never had any contact with the members of any terrorist organization. The court noted that "[Jumaev's] guilt rests on far less culpable conduct than that of all other defendants of which I have been aware who have been convicted under the same statute." *Id.* at *1. The Court credited Jumaev's arguments

that he could have intended to repay his debt to Muhtorov while knowing that the funds would go to support an FTO. The Court further stated that if "Jumaev's offenses were truly calculated towards a political objective, Mr. Jumaev would have done more, *e.g.*, contributed more money on more occasions via a more reliable conduit to a more robust organization. Simply put, his offenses were not calculated at all." *Id.* at *6. The contrasts to the defendant's case are obvious. The defendant was directly in contact with multiple ISIS members in Syria. He engaged in a highly calculated and concerted campaign over three years to raise funds for ISIS, carefully vetting recipients and using different contacts to verify others. And the more than $185,000 that he sent during the charged conspiracy is approximately 61,666 percent more than the $300 sent by Jumaev.

In *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), the defendant pled guilty to opening six social media accounts on two occasions for people he understood to be ISIS members, knowing that he was providing support to ISIS members, and knowing that ISIS was a terrorist organization. The Ninth Circuit reasoned that "one can open a social media account for a terrorist organization without knowing how that account will be used," and noted that the evidence actually supported that Alhaggagi did not know how the accounts would be used. *Id.* at 702–03. In contrast, the defendant sent money *knowing* it would be going the mujahideen; he also stated he would continue helping Umm Dujana and S.A. Weaver for that purpose so long as he was not explicitly told in the group chat. The defendant sent money to ISIS women after being told by the FBI that his previous recipient, Joyce Ann Fornal, had been arrested with ISIS flags and bombmaking materials. And he continued sending money to ISIS women as he was celebrating the role of ISIS women in combat online, and while trying to marry the leader of an all-female ISIS fighting

10

battalion. The cases cited by the defendant are thus highly factually different. There can be no doubt that the terrorism enhancement applies.

    C.  "Double Counting"

    The defendant further objects that the terrorism enhancement (§ 3A1.4(a)) and the specific offense characteristic discussed above (§ 2M5.3(b)(1)(E)) require the Court to "double-count the same factors." Double counting—when a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision—is permissible unless the Guidelines expressly prohibit it in a given circumstance. *United States v. Reevey*, 364 F.3d 151, 158 (4th Cir. 2004). Thus, "[a]n adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines expressly exclude its applicability." *United States v. Williams,* 954 F.2d 204, 207 (4th Cir. 1992). Nothing in either § 2M5.3 or in § 3A1.4 prohibits the application of both provisions, and they are routinely applied together. *See Hammoud*, 381 F.3d at 356; *Young*, 818 Fed. Appx. at 190—91. The defendant's double counting claim therefore fails.

    D.  Other Relevant Guideline Provisions

    U.S.S.G. § 3C1.1 provides for enhanced guidelines for obstructing or impeding the administration of justice. The commentary to the guideline states that although avoiding or fleeing from arrest does not ordinarily warrant application of this Guidelines adjustment, it may warrant a greater sentence within the otherwise applicable Guideline range. In this case, the defendant fled the United States after law enforcement searched his house in 2019. As detailed in the government's Detention Memorandum and 404b Motion, the defendant went to elaborate lengths to evade the FBI, escape to Mexico, and travel to the Middle East, all because he assumed he would be arrested after transferring money to ISIS women in the Philippines. Only through

11

extraordinary international cooperation was the defendant returned to the United States. This flight from law enforcement merits consideration by the Court in arriving at an appropriate sentence.

U.S.S.G. § 3B1.1 provides for Guideline adjustments for aggravating roles depending upon the size of a criminal organization and the degree to which the defendant was responsible for committing the offense. The commentary notes that an upward departure may be warranted in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the activities or assets of a criminal organization. That is what the defendant did here in this widespread terror funding network. He received financial transfers from dozens of ISIS sympathizers located all over the world, maintained control of the money until he had a sufficient quantity to make the transfer fees palatable, and then remitted funds to multiple women in ISIS. The defendant also provided advice and guidance to ISIS sympathizers as to how to safely send money and evade law enforcement. *See* Gov. Exh. 2-107. He also purchased fake phone numbers in bulk and distributed them to ISIS women in Syria so that they could create encrypted Telegram accounts and conduct their affairs with him and others in secret. *See, e.g.*, Gov. Exh. 2-99 at 4, 12. In other words, the Guidelines suggest that the defendant's leading role in this illicit network should be taken into account, even though not necessarily qualifying for the aggravating role enhancement.

E.  Total Offense Level and Advisory Guideline Range

The government thus agrees with the PSR's calculation of the defendant's Guidelines. His base offense level is 26 (U.S.S.G. § 2M5.3(a)); he has a specific offense characteristic that adds two more levels (U.S.S.G. § 2M5.3(b)(1); and he qualifies for the terrorism enhancement, adding 12 levels (U.S.S.G. § 3A1.4). His total offense level is thus properly calculated at a level 40. As discussed above, the terrorism enhancement requires that the criminal history category be

increased to Category VI. As a result, the defendant's Guideline range is 360 months to life imprisonment. By virtue of the statutory maximums, the high end of the Guidelines is reduced from life imprisonment to 100 years. *See* U.S.S.G. § 5G1.1(a).

When, as here, the low end of the Guideline sentencing range is greater than the statutory maximum for the counts of conviction, the Guidelines call for the sentences on the counts to run consecutively as necessary to permit the imposition of the full advisory Guidelines sentence. U.S.S.G. § 5G1.2(d).

## II.    The Sentencing Factors under 18 U.S.C. § 3553

Additionally, the § 3553(a) factors that the Court must consider all point heavily towards the need for a lengthy sentence.

### A.    The Nature and Circumstances of the Offense

The nature of the offense—providing material support to ISIS—is incredibly serious. ISIS is one of the most violent and vile terrorist organizations in existence. Its atrocities have been well catalogued and include the enslavement and genocide of the Yazidi ethnic minority population, rape, public beheadings of journalists, burnings, and dozens of deadly attacks around the world, including in the United States. The defendant was not only aware of these atrocities, but he celebrated them. He defended ISIS for burning a Jordanian pilot alive inside a cage; he gleefully told his brother about ISIS raiding a prison and killing the jailers there; he approved when told of a jihadist who had taken a Jewish man hostage; and he lamented the fall of their territorial caliphate that allowed ISIS to exercise complete dominion and control over innocent Iraqi and Syrian civilians trapped under their rule.

The defendant, knowing full well about ISIS's heinous crimes and the illegality of providing support to this group, fundraised and surreptitiously transferred money to ISIS members

13

for years. The amount of money involved over the course of the charged conspiracy—more than $185,000—is staggering. That figure does not take into account money that the defendant sent immediately prior to the charged conspiracy, which includes an additional $12,300 going to Joyce Ann Fornal in the Philippines.

It is often said that money is the lifeblood of terrorist organizations. *See, e.g.*, *Terrorist Financing since 9/11: Hearing Before the H. Subcomm. on Counterterrorism and Intelligence*, 112 Cong. (2012). Terrorist organizations require funds for operational support and to meet broad organizational requirements. Financial Action Task Force [FATF], *Financing of the Terrorist Organization ISIL*, at 34, https://www.fatf-gafi.org/en/publications/Methodsandtrends/ Financing-of-terrorist-organisation-isil.html. ISIS expends significant resources to break its members out of prison camps, to pay salaries, and to support the families of fighters.

The defendant was thus helping to satisfy some of ISIS's primary needs. The amount of money sent by the defendant would have had a substantial effect—escape from prison camps costed between $10,000 and $20,000 dollars, and living expenses in Syria were as little as $100 per month. In other words, the more than $185,000 sent during the charged conspiracy went a long way towards helping ISIS members escape and continue serving the FTO. And once these female ISIS members have escaped, the Court has seen the damage that they can do. Umm Dujana herself escaped from Al-Hol. Since then, she has become a major fundraiser online, she has plotted terror attacks against "the West," and she has supplied funds directly to ISIS mujahideen in various ISIS provinces. Other escaped women may have gone back to fighting on the front line alongside the mujahideen to whom the defendant gave money. We will never know exactly how many dollars went where, what the intended purpose was behind every transaction, or precisely how much misery and death ISIS was able to mete out as a result of the defendant's giving. What is clear is

14

that the defendant provided *a lot* of material support to this organization, and any provision of material support "frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups to persist, recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

And without the defendant, this money would never have made it to ISIS. In addition to providing his own funds, he was the crucial middleman connecting would-be donors to the terrorists themselves. He was the one dispensing advice, creating fake phone numbers and Telegram accounts, traveling hundreds of miles to make cash pickups, and doing all the things necessary for this scheme to flourish. He was the one "aiming for the things no one is willing to do in our times right now." *See* Gov. Exh. 4-13 at 23. Without him, the scheme fails.

B. History and Characteristics of the Defendant

The defendant's history and characteristics indicate that for nearly his entire adult life, he has been a supporter of foreign terrorist organizations—first Al Qaeda, then ISIS. Back in 2008, at the U.S.-Canada border, the defendant discussed wanting to travel overseas, fight with his Muslim brothers, and kill Americans. In 2009, at an interview to be a baggage handler at Dulles airport, he expressed his admiration for Anwar Al-Awlaqi. In other words, the defendant has been a committed advocate for terrorism for over 15 years. And once he decided to begin providing financial support to the organization, he was unshakeable in his desire to continue. In August of 2019, the FBI sat him down and warned him that the money he was sending overseas was supporting terrorism. Nevertheless, he persisted. As he told the undercover agent testifying under the name Imran Jones, "I don't care who it is, whether it's my parents, my wife…anyone who is

15

going to intervene and tell me to stop doing something for the sake of Allah, I'm not going to listen to them. I'm going to do what pleases Allah no matter what." Gov. Exh. 5-1A at 5.

The conduct at issue in this case was thus not a momentary slip of judgment, nor was it the result of a young man making a rash decision. Rather, it was the product of years of deliberation when, at approximately age 30, the defendant decided to begin sending money to ISIS. Despite warnings from the FBI, he would continue for years until law enforcement arrested him.

C.  The Need for the Sentence Imposed to Promote Respect for the Law, to Afford Adequate Deterrence, and to Protect the Public.

The evidence at trial demonstrated repeatedly that all of the participants in this terror funding network—the defendant, the people who sent him funds, and the people who received the funds—all knew they were engaged in illegal activity. A Facebook user even sent the defendant an article of an English man imprisoned for using Bitcoin to free ISIS supporters from camps in Syria. Gov. Exh. 2-106. But, nevertheless, they devised a scheme that they thought would insulate most funders from criminal liability. The defendant would act as a middleman, providing donors with a level of plausible deniability about the intended destination of the funds. Clearly, neither the defendant nor anyone else involved has any respect for the laws of the United States. Their only interest appeared to be how they could circumvent the law in order to fund more terrorism.

There is also a strong need for general deterrence in this case. One source of funding that "[ISIS] relies on [is] grass-roots funding sources," that it procures by "[using] social media platforms to secure individual-level acts of material support." Financial Action Task Force [FATF], *Financing of the Terrorist Organization ISIL*, at 36, https://www.fatf-gafi.org/en/publications/Methodsandtrends/Financing-of-terrorist-organisation-isil.html. This method of funding provides "more anonymity and greater opportunity for fraud and the obscuring both the source and recipient of the funds." *Id.* In other words, the kind of conduct that the

16

defendant was engaged in is a consistent revenue stream for the FTO, and detecting and prosecuting schemes like this is difficult and complex work. In this case, the defendant used encrypted messaging applications, virtual private networks, cryptocurrency, and transnational money couriers, all while masking the scheme in humanitarian terms. All of this necessitated a lengthy and expensive investigation to amass sufficient evidence to prove his guilt beyond a reasonable doubt. As the risk of capture and conviction diminishes, so too will respect for anti-terror financing laws. Where the risk of detection is seen as relatively small, and the punishment for violations regarded as relatively slight, there can be no deterrence of these crimes. To promote respect for the law, and deter others, when a perpetrator like the defendant is arrested and convicted, the penalties for such crimes must be significant.

Finally, a lengthy period of incarceration is needed to protect the public from the defendant. As previously noted, the defendant's entire adult life appears to be centered around support for terrorism. He has been advocating for these organizations for over 15 years; he attempted to marry the "Empress of ISIS;" he obsessively posted and fundraised for this organization. And he has said nothing will stop him—he will do "what pleases Allah no matter what." *See* Gov. Exh. 5-1A at 5. While no one can predict the future, the evidence in this case suggests that the defendant will only cease to provide material support to terrorist organizations for the time that he remains in prison.

### D. The Need to Avoid Unwarranted Sentencing Disparities

The defendant has no co-defendants in his case, and the Fourth Circuit has made clear that "comparisons of sentences [across different cases] may be treacherous because each sentencing proceeding is inescapably individualized." *United States v. Friend*, 1 F.4th 369, 382–83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)). In addition to the difficulty of comparing facts and circumstances across cases, it is also impractical to survey all

17

§ 2339B convictions. The surest way to avoid unwarranted disparities is to carefully review, calculate, and consider the sentencing guidelines. *See United States v. Sueiro*, 59 F.4th 132, 141–42 (4th Cir. 2023) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007) (explaining that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges")). But, to the extent it is helpful, defendants are routinely sentenced to lengthy prison terms for providing material support to terrorist organizations, and a few cases with some similarities to the defendant's are provided below.

   1. Mohammed Youssef Hammoud

On July 31, 2000, Mohamad Youssef Hammoud was charged in an indictment with violations of 18 U.S.C. § 2339B and numerous other offenses, all of which were connected to his support for Hizballah. *United States v. Hammoud*, No. 3:00-147 (W.D.N.C. July 31, 2000) (indictment filed); s*ee also United States v. Hammoud*, 381 F.2d 316, 325 (4th Cir. 2004).[2]

After a jury trial, he was found guilty on June 24, 2002. *Hammoud*, No. 3:00-147, Dkt No. 829. The "largely undisputed" facts relevant to the material support charges were as follows:

> In 1996, Hammoud began leading weekly prayer services for Shi'a Muslims in Charlotte. These services were often conducted at Hammoud's home. At these meetings, Hammoud—who is acquainted with both Nasserallah and Fadlallah, as well as Sheikh Abbas Harake, a senior military commander for Hizballah—urged the attendees to donate money to Hizballah. Hammoud would then forward the money to Harake. The Government's evidence demonstrated that on one occasion, Hammoud donated $3,500 of his own money to Hizballah.

*Hammoud,* 381 F.2d at 326. At trial, one of the government's witnesses testified that although there had been some talk of obtaining "dual use" technology such as global positioning systems for Hizballah, "Hammoud had declined to become involved in providing equipment because he

---

[2] Following *United States v. Booker*, 543 U.S. 220 (2005), the decision was vacated and remanded for resentencing. The Fourth Circuit later re-affirmed the decision in all material respects, relying upon the same facts. *United States v. Hammoud*, 483 Fed. Appx 865 (4th Cir. 2012).

was helping Hizballah in his own way." *Id.* Hammoud was about 22 years old when he began leading the weekly fundraising meetings that led to his conviction, and at the time, the statutory maximum for a violation of § 2339B was 15 years. Hammoud was sentenced to 30 years in prison on January 27, 2011. *Id.*

2. Nicholas Young

On December 15, 2016, Nicholas Young, a former police officer, was charged by indictment with one count of attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and three counts of obstruction of justice.[3] *United States v. Young*, No. 1:16-cr-265 (E.D. Va. Dec. 15, 2016) (indictment filed); *see also United States v. Young*, 818 Fed. Appx. 185 (4th Cir. 2020). On December 18, 2017, the defendant was convicted at trial of the attempted material support charge, as well as of two counts of obstruction of justice. The obstruction of justice convictions would eventually be vacated on appeal.

At trial, the facts demonstrated that an FBI informant told Young that ISIS needed more fighters and that codes from Google gift cards could be used to buy accounts for an encrypted messaging service to help contact recruits. In response, Young transmitted $245 in gift cards to the informant. *Young*, 818 Fed. Appx. at *189. Young was sentenced to 15 years in prison for this single financial transaction to an FBI informant. No funds actually reached ISIS.

3. Benjamin Carpenter

On March 23, 2021, Benjamin Carpenter was indicted for one count of attempted provision of material support to ISIS. *United States v. Carpenter*, 3:21-cr-38 (E.D. Tenn.). On October 19, 2023, following an eight-day trial, Carpenter was convicted of that sole count. The facts

---

[3] One count of obstruction of justice was dismissed pre-trial.

demonstrated that Carpenter contacted an individual he believed to be affiliated with ISIS's central media bureau, but who was in fact an undercover FBI employee, and provided translation services for a project intended to relaunch ISIS's official foreign language media arm. On July 17, 2024, Carpenter was sentenced to 20 years imprisonment—the maximum punishment for the offense—and no translation services were actually received by ISIS.

## III.    Conclusion

For all of the foregoing reasons, the United States respectfully submits that all of the factors that the Court must consider—the remorseless character of the defendant, the need for general and specific deterrence in this case, and the need to provide just punishment—lead inexorably to a very substantial sentence of incarceration. Given the defendant's central role in this terror funding scheme, the vast sums that he transmitted, his commitment to jihadist ideology, and his total failure to accept any responsibility for his conduct, the government requests a Guideline sentence.

Respectfully submitted,

Erik S. Siebert
UNITED STATES ATTORNEY

_____/s/_____
Anthony T. Aminoff
Amanda St. Cyr
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov

Andrew J. Dixon
Trial Attorney
Counterterrorism Section
National Security Division, Dept. of Justice

20

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of April, 2025, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system.

                                          _____/s/_____
                                          Anthony T. Aminoff
                                          Assistant United States Attorney
                                          United States Attorney's Office
                                          Eastern District of Virginia
                                          2100 Jamieson Avenue
                                          Alexandria, VA 22314
                                          Telephone (703) 299-3790
                                          Facsimile (703) 299-3980
                                          Anthony.aminoff@usdoj.gov